The third case, 25-1892 Western Missouri, Jane Does et al. v. David Flannigan et al. Guy Hamilton-Smith Good morning, Your Honors. May it please the Court, Guy Hamilton-Smith for Appellant Jane Does et al. Whatever it began as, Missouri's sex offense registration system is punishment as it exists today. This conclusion is supported by the unrefuted expert testimony, the issues that were conclusively established pursuant to Rule 36, the design and implementation of the registry, as well as the experiences of the nine families who brought this case, some of whom are here today. Twenty-three years has passed since Smith v. Does was decided by the Supreme Court, and the world that we live in is very different now. Technology of the sort that we have come to rely on today was only in its infancy then. Registries themselves were not the subject of extensive scientific inquiry, and the law itself is very different from Alaska's first-generation mail-in registry that Chief Justice Roberts then argued in the case for Alaska compared to being no more onerous than filling out a price-clip application. This evidence matters in this case because it speaks to the same Mendoza-Martinez factors that the Supreme Court relied on in Smith v. Does, and the District Court's refusal to consider this case. There are several issues in this appeal, and I'd like to use my time before you this morning to focus on this threshold punishment question and to otherwise rest on the briefs unless Your Honors have any particular questions which I'll be happy to address. Well, let me ask you, even if it is punishment, doesn't it also have to be barbaric or grossly disproportionate? How do you get there? Well, yes, Your Honor. With respect to the Eighth Amendment claim, absolutely. And I think we never really got to address that thoroughly in the District Court because we're still at this sort of threshold, which is why I think of it as a threshold question of punishment because in order to get to the Eighth Amendment, it first has to be punishment, which is then viewed through the Mendoza-Martinez factors. But with respect to your question, you know, there are, I think, several ways that we can get there, such as it not being, not having any relationship with the underlying facts of the case. For example, in one of our plaintiffs, Jane Doe One, she doesn't have a reportable conviction. And so in the eyes of the prosecutor who charged her, the judge who sentenced her, her crime was not so that she has to register for the rest of her life, which has significant impacts on her, her family, her children. But again, we still have to get to this sort of threshold punishment question with the Mendoza-Martinez factors, which themselves contemplate an empirical analysis, in particular two factors, rational relationship with a non-punitive objective and excessiveness with respect to that objective. And they call for an empirical analysis because that's what the Supreme Court did in Smith v. Doe. It's just we have different data now. We have different inputs. We have a lot more scientific analysis that's gone into these questions over the last, you know, 25 years. And other courts have done this as well, evaluated this sort of scientific evidence in assessing these questions, such as the Sixth Circuit and Snyder. Now here, the expert evidence and the request for admission are both on the appellant's side with respect to finding that these factors support finding that the registry is punishment. For example, the patrol's expert, Dr. Anna Salter, excuse me, Your Honor, testified that she didn't know anything about registries or whether they work, don't work, or anything like that. And so appellant's evidence was unrefuted on this point, which in part establishes that 25 years of study tracking the release trajectories of nearly half a million people found that it has no impact on reducing recidivism or sexual violence. And furthermore, that risk is not a static variable, but that declines as people remain in the community without a new crime, such that most people after 10 years are no riskier than anyone else in the community. And after 20 years, no one is. And so lifetime registration obligations can serve no public safety benefit. But the expert evidence aside, the request for admissions that conclusively establish many of these same issues that speak to these Mendoza-Martinez factors, in particular RFA number 50, being that there is, quote, no available evidence that demonstrates or tends to support the conclusion that Missouri's sex offender registry has any demonstrable public safety benefit with respect to a reduction in sex offenses, sexual violence, or registrable offenses. Because of these facts and the request for admissions that are conclusively established, these two Mendoza-Martinez factors, again, weigh in the appellant's favor here. And because they do, the factor about promoting a traditional aim of punishment also weighs in our favor, because if the law is not serving a legitimate, non-punitive objective, then the only other option is punishment. As I said in the beginning, changes in technology have also impacted this analysis. The Supreme Court has recognized that, and as recently as last summer in Free Speech Coalition v. Paxton, also in cases like Riley with the Fourth Amendment and cell phones. Over the last 23 years, again, technology has changed dramatically. In 2003, about 40%, I believe, of Americans didn't even use the Internet. And now we all carry it with us wherever we go. These changes have turned the registry into something much less like what Justice Kennedy envisioned in 2003 as a visit to an official archive of information. I know you keep referring to 2003 for the Supreme Court decision. To what extent are we bound by it, though? It seems to me like your argument appears like an argument to the United States Supreme Court. Your Honor, I think our argument here is not that. I mean, we are, of course, bound by Smith v. Doe. And what we're urging is that this court actually undertake the analysis that the district court should have, but that the district court didn't do, and instead just essentially ticked the boxes. But as we say, as I said a few minutes ago, these factors call for essentially the court rolling up its sleeves and wrestling with this evidence. Because, again, that's what the Supreme Court did in 2003 with the data that it had available to it at the time in evaluating these factors. So we're not saying that a different test is needed, but the world is different, the data is different, and we need to have that analysis actually done in order to, I think, go through this Mendoza-Martinez test. This is essentially the argument that we're making. Justice Kennedy, in 2003, with respect to these Mendoza-Martinez factors of being comparable to the historical form of punishment and imposition of disabilities and restraints, Justice Kennedy said, well, this is like a visit to an official archive of information and unlike forcing people to appear in public for public shaming or scorn. But, again, these changes in technology have transformed the Internet. In Packingham, the Supreme Court recognized that the town square is now also a digital place. And so in order to encounter this registration information, people no longer need to visit this official archive. They can encounter it inadvertently, such as Dr. Lageson's expert report demonstrates that people can search the address of a business in Missouri, and it will then return if anyone on the registry is working at that business. So they're not even looking for registry-related information, but can still encounter it. The registry itself has advanced mapping and tracking capabilities that are then also, this information is also harvested by third-party data brokers who commodify this information and push it to consumers, again, who are not even searching for it. And the effects of these changes are apparent and is much more closely analogous today to a permanent and inescapable badge of stigma. Furthermore, changes in the law itself, as I said at the beginning, are also relevant to understanding this system of being punishment. Because again, in 2003, the Supreme Court was considering what you'd call a first-generation registry statute that allowed for people to submit updates through the mail. This law is something very different. And as the evidence in the record shows, people who are required to register have to undergo numerous and time-consuming in-person registrations. And this is something that's going to require reports to law enforcement to update any even minor changes to their information. And if they don't do this, then they're going to be charged with a felony offense that I believe in Missouri has mandatory minimum terms of imprisonment. And this is thus much closer to the historical form of punishment, probation and parole. Now it's true that it's not a probation officer that would be inflicting sanctions on people who don't abide by these restrictions. But in other respects, this system is more draconian because there's no ability to tailor restrictions to an individual's needs. There's no graduated sanctions. And there's furthermore no, as I said, no ability to tailor the restrictions to an individual's needs. It seems to me that the harm that we're looking at here is something that is ubiquitous in this age of information. And it really doesn't matter very much whether there's a registry or not. Just because every conviction is a matter of public record. It's filed someplace. Anybody can find it. It can be aggregated and sold and is aggregated and sold. And people find themselves oppressed as a result of it. And that the bottom line is that even as late as the 1980s, maybe even the early 1990s, you could get in your car. You could move seven states away. You could go to work. Take a menial job. Work your way up. Find yourself accepted in a community. Be accepted. Be left alone. And nobody would find out that you had a prior conviction. And if they did, by the time they found out, they didn't care. But in this new world, there is no empathy. There is no compassion. There is no humanity. Everything is stuck on a database somewhere, everywhere. And the harm that you're seeking to fix here is really unfixable as a matter of policy unless you can convince legislatures everywhere to change how data can be collected and sold. Absolutely, Your Honor. I mean, I think that's a very astute observation about our modern times. I think the distinction between respect to this scenario is that the registry is distinct from sort of neutral, historical, criminal record information, which just provides this person was convicted of a crime on this date. This is something very different because it requires people to continually update their information and essentially broadcast that out to the public. And the design of the whole thing implies that people are dangerous. And there are levels of offenses that are identified, which clearly does change things. I'm sorry. I didn't mean to eat up your whole rebuttal. No, no. That's fine. And I'll reserve the rest of my time for rebuttal. Good morning, Mr. Weems. Thank you, Your Honor. May it please the Court. This case involves the constitutionality of the Missouri Sex Offender Registration Act, which is often referred to as SORA or Megan's Law. So I'll be using those terms throughout today's oral argument. The district court rejected all but one claim that was raised by appellants, and that claim neither side appealed. So that means the entire judgment that is on appeal at the moment was in favor of the patrol. And the patrol respectfully asked this Court to affirm said judgment. Today I'd like to address four points. Just real quick, what happened to the one claim? The one claim was about prior restraints and whether or not there's a provision within the sex offender registry that did require people to register their online identifiers before using them. I just want to know if we have a final judgment. There is a final judgment on that, but the judgment itself was so narrowly tailored and so narrowly construed, the patrol did not appeal that portion of the judgment. Today I'd like to address four points. First, the Missouri SORA is a civil scheme that is not sufficiently punitive to trigger Eighth Amendment or ex post facto analysis. Second, the defendant's due process and equal protection claims fails a matter of law because there's not a fundamental right. There's not a suspect class, and it passes rational basis review. Third, appellants never pled an overbreadth claim with fair notice. And fourth, the term other identity information, as that is used in Chapter 43-651, is not sufficiently vague or is sufficiently clear to avoid any void for vagueness issues, especially in conjunction with the patrol's form. First, SORA is not punitive. Under Smith and Mendoza, appellants' Eighth Amendment and ex post facto claims fail as a matter of law. Again, as a counsel for appellants aptly put it, that is a threshold issue. If it's not punishment, you don't even reach the question to the judge's point of whether or not this is barbaric, tortuous, or for the sake of inflicting pain. And here, to Judge Benton's point, Smith is controlling. There is simply no precedent in any court for throwing out an entire sex offender registration scheme. What about the Sixth Circuit case? The Sixth Circuit case was more focused. It dealt more with the exclusion zones. It dealt more with where individuals were able to travel, and that's not at issue on this appeal. But fundamentally, this case is almost identical in many respects to the Alaska SORA that was issued in Smith. But the Sixth Circuit did say it was punishment, right? The Sixth Circuit did say that it was punishment. You are correct. Is that the only circuit and maybe the only court to say anything about these kind of schemes are punishment? I believe other courts have addressed whether or not it is punishment, but I do believe that the... individual parts of these systems are punitive. Individual portions, yes, but not an entire scheme. What was the portion, would you tell me what was at issue in the Sixth Circuit? My recollection is that it had to do with the exclusion zones. It had to do with the fact that certain individuals were not allowed to travel to certain places. And because you couldn't travel within a certain distance of a school or a certain distance of a park or whatever the case may be, that effectively prevented them from even engaging in basic travel. And Missouri's laws on that are not on appeal, right? They are not on appeal. Importantly, those were some claims in the Second Amendment petition. Those were ultimately dismissed by the lower court because those exclusion zones are not actually part of SORA. Those exclusion zones are found in Chapter 566 and are predicated on an adjudication or conviction rather than registration. So even if you got rid of the entire SORA scheme... Thank you, proceed with your argument. Correct. That did it. But federal courts have rejected similar claims against entire sex offender registries consistently. In fact, when challenging the federal SORNA, which is the Federal Sex Offender Registration Notification Act, the Sixth Circuit found in Wilman v. Attorney General of the United States that punishment challenges, trying to argue that sex offender registration acts, specifically the federal one, are punishment, was not even facially plausible and cited a bevy of Circuit Court cases, to your point earlier, as to what cases have transpired. Here, the District Court properly found that Missouri SORA was not passed with a punitive intent. This is a finding that is not challenged by the appellant. Likewise, the District Court properly found that Martinez-Mendoza factors showed that Missouri SORA, in its necessary operation, was not sufficiently punitive to override this non-punitive intent. Like the Alaska Registry at issue in Smith, Missouri SORA is not comparable to historical punishment. It does not impose sufficient affirmative restraints, it is not primarily aimed at retribution, and it is not excessive with its underlying purpose. Before moving on, there are three issues that are related to this punishment analysis that I would like to highlight for the Court. First, appellants erroneously argue in their briefing that the trial court found their evidence of recidivism and the effectiveness of the SORA regime was, quote, not relevant. That's on the appellant's brief at page 36. But that contravenes the record. In its order on summary judgment, specifically page 251 of the joint appendix filed by the parties, the lower court found that the recidivism issue was decided by concessions that appellants had made on summary judgments. In footnote 10, the lower court pointed out that these concessions were made in response to plaintiff's statement of uncontroverted facts, paragraphs 19 through 21 and 28. The trial court properly found that these concessions were fatal to the recidivism arguments raised by appellants. In essence, while they had presented a bevy of evidence showing that perhaps Missouri SORA does not achieve all of its goals with scientific accuracy, these concessions gave up the proverbial ghost. There was enough there to satisfy rational basis. Second, appellants admit in their opening brief that the trial court determined that Missouri SORA was rationally related to the non-punitive purposes of, quote, alerting the public to the presence of sex offenders in their community and assisting law enforcement in preventing and protecting against the commission of future offenses. That's from appellant's brief pages 35 through 36. But notably, appellant's briefing almost completely ignores those other findings. It focuses exclusively on the recidivism evidence that the underlying court allegedly did not give due weight to. Appellant's failure to grapple with these other rational bases offered by the appellees and accepted by the trial court is likewise fatal in a Martinez-Mendoza analysis. And finally, appellants ask this court to broaden the Martinez-Mendoza factors to include the secondary effects that Missouri SORA has on the family members of registrants. While the Martinez-Mendoza factors are not an exhaustive list of findings that the Supreme Court has previously made, they all share one common thread. They focus on what the statute itself requires. In fact, when the Smith court was applying Martinez-Mendoza to the Alaska SORA, they said that they were examining the scheme, quote, in its necessary operation. To borrow language from one of appellant's own expert witnesses, Martinez-Mendoza looks at the direct legal consequences that a statute has on those who are subject to it, rather than the indirect social consequences of those around them. Appellant's request for this court to create a brand new factor for secondary effects on family members contravenes established Supreme Court jurisprudence and should be rejected by this court. In the interest of time, I'm going to move on to the overbreadth claim and explain how that overbreadth claim was properly rejected by the lower court. Regarding appellant's assertion that count 11 fairly raised an overbreadth claim, the district court properly rejected that argument. The federal pleading standards under Twombly require more than just labels or implications. You have to give the other side and the court fair notice of what a claim actually entails. Here, the very first time that appellants talk about an overbreadth claim is on summary judgment. The patrol pointed out that this was effectively a brand new claim and was inappropriate for summary judgment. And the district court agreed. Importantly, when you look at that decision, the district court says, I already looked at, in the judgment on the pleadings, I already looked at what exactly count 11 was. It was effectively aggregating counts 12 and 13, which dealt with the right, infringed on the right to anonymous speech in the prior restraint issue. That this was a chilling speech claim that effectively aggregated all the individual harms into one unified banner. But nowhere in there did the appellant or indeed, I'm sorry, did the appellees or even indeed the trial court see an overbreadth claim. Even if, for the sake of argument, appellants had always intended to bring an overbreadth claim, a fact that is not really supported by the record. They failed to give sufficient notice of that claim. Finally, I want to discuss other identity information and the void for vagueness challenge that has been raised by the appellees. I'm sorry, by the appellants. This void for vagueness claim fails as a matter of law because the term other identity information that is found in chapter 43, 651, subsection 1.4 is readily susceptible to two different limiting constructions. One of which was adopted by the district court below and one of which is based on, in fact, the appellee's own expert testimony. Each of these limiting constructions are fatal to the DOE's void for vagueness challenge. First, I'll address the limiting construction that's based or supported by appellant's own expert testimony. Appellant's void for vagueness claim is limited to the general catch-all phrase in 43, 651 that is preceded by several very specific examples. Canada's statutory construction dictate that when a general term is preceded by specific examples, those specific examples provide important limiting context for that general term. Here, the term other identity information does not occur in a vacuum. It is preceded by specific examples such as email addresses, instant message screen names, etc. The patrol believes that these examples provide sufficient context to allow a person of ordinary intelligence to discern what other identity information means. And appellant's own experts acknowledge that there was a common trend line that could be used. Did the experts address the constructions right on the form, the exhibit? I'm sorry? Did the experts address the instructions that are right on the form, exhibit HH, I believe it is? You are correct, Your Honor. Yeah, but did the experts address that, the language on the form? I don't believe so. I believe that they were focusing almost exclusively on the language in Chapter 43 and in Chapter 589. Thank you. But when we look at those chapters, specifically at 43.651, the definition of online identifiers, the experts did acknowledge that there were common trend lines, again, that could be used by a person of ordinary intelligence to figure out or give some guidance as to what other identity information can mean. To Judge Benton's question, that actually leads us to the second narrowing construction, or limiting construction. This is the one that was adopted by the courts based on the form promulgated by the patrol. This construction effectively eradicates any potential claim of vagary. Missouri's SORA requires Appelese, the patrol, to publish a form for local law enforcement to use during the registration process. This form can be found, as was noted before, in Exhibit HH. But importantly, registration can only take place on this form. Missouri's SORA is crystal clear about that. Notably, this form does not ask for other identity information. If you go through Exhibit HH, that phrase doesn't appear there. Instead, what it does is ask for specific pieces of information that are readily discernible. Thus, any registrant who is potentially confused by the term other identity information would be immediately disabused of that confusion upon arriving to register. Because again, the form provides narrowing context that would assist the registrant in understanding what that means. So even if there is any degree of vagary, which again, the patrol does not believe there is any vagary within that. They believe that the preceding examples provide sufficient context. But even if there was any degree of vagary, such vagary would be immediately rectified by the patrol's form. And that's what the trial court found below. Unless there are any other questions, I'll yield the rest of my time back to the court. Hearing none, very well. Thank you. Thank you. Just a couple quick points to address. One is that the Sixth Circuit decision in Snyder that Judge Benton highlighted did also involve the registry. The exclusion zones were part of that challenge, but their analysis was sort of tracking along the same lines as what I was suggesting earlier. With respect to the concessions that my friend was referring to, there was no such concession made with respect to the effectiveness or public safety objective of the registry. And in fact, that was conclusively established by way of Rule 36. Because again, the RFAs all speak to that very issue. And then also, Judge Benton, you had asked about other courts that had found that these systems are punishment. There are several other decisions in the briefs. Notably, the appellant in Smith v. Doe, subsequent to losing that case, brought an ex post facto claim in Alaska on state constitutional grounds and prevailed there. But there have been a number of other challenges around the country that have reached similar conclusions. And of course, also other cases against us, too. And what we're asking this court to do is to look at this record and this evidence and do its own evaluation. Isn't the ex post facto claim here effectively moot by the Missouri Supreme Court decision? I don't believe so, Your Honor. Because this court, of course, is going to be the final word in terms of the federal constitutional principles. And in addition, that decision did not have the record in terms of experiences of family members, expert testimony that speak to them. But didn't the Missouri Supreme Court already say that it couldn't be applied to people convicted before it went into effect? Oh. I believe that the Missouri Supreme Court did say that some portions of it can't be applied retroactively. I believe state constitutional grounds for, I believe in the Missouri Constitution, there's a civil ex post facto provision. But this is more, I think this is, my understanding of that case is a little bit of a different issue. It's just my understanding.